IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| B. THOMAS AND COMPANY, | |
| Plaintiff, | **8:18-CV-112** |
| vs. | |
| UNIVERSAL WARRANTY CORP., and ALLY INSURANCE HOLDINGS INC., | **MEMORANDUM AND ORDER** |
| Defendants. | |

## I. INTRODUCTION

This is a contract case involving claims of breach of contract, tortious interference, unjust enrichment, breach of the duty of good faith and fair dealing, fraudulent concealment, and negligent misrepresentation. *See* Filing 1. Plaintiff claims it is entitled to continuing commission payments on certain contracts it entered into with Defendants. Filing 1 at 19. This matter comes before the Court on Defendants' Motion for Summary Judgment as to all of Plaintiff's claims. Filing 79.

In deciding Defendants' Motion, the Court has reviewed the contracts, the evidence submitted, and the law applicable to the contracts in detail. Upon such review, the Court has concluded the material provisions of the contracts implicated by this lawsuit are unambiguous. The continuing commissions requested by Plaintiff in this lawsuit are not obligations of the Defendants pursuant to the plain language of the agreements that both parties signed.

In its response to Defendants' Motion for Summary Judgment, Plaintiff invites this Court to manufacture ambiguity in contracts that clearly outline the terms upon which commissions are owed through providing "course of performance" and "extrinsic" evidence. Binding Nebraska law

and Eighth Circuit precedent do not allow such evidence to control over clear contractual language. For the reasons stated herein, the Court grants Defendants' Motion for Summary Judgment.

## II. BACKGROUND

### A. The Parties

Plaintiff, B. Thomas and Company d/b/a National Financial ("National Financial"),[1] is an independent agent offering vehicle service contracts and related products to motor-vehicle dealers for sale to the dealers' customers. Filing 91 at 11. As an independent agent, National Financial markets vehicle service contracts and guaranteed asset protection ("GAP") contracts to automobile dealers to sell to their customers. Filing 91 at 12. The vehicle service contracts and GAP contracts at issue in this case were administered by Defendants, the Universal Warranty Corporation ("Universal Warranty"), a wholly owned subsidiary of Ally Insurance Holdings, Inc. ("Ally"), who competed with other companies to have automobile dealers sell their products. Filing 91 at 11; Filing 91 at 12. Universal Warranty, in addition to administering the contracts National Financial sold to dealers, also engaged in some direct sales to dealers itself. Filing 91 at 14.

### B. The Products

Vehicle service contracts are warranties that protect an automobile against mechanical breakdown. Filing 91 at 11. GAP contracts insure vehicles by paying to a vehicle owner the difference between the cash value and the balance of a lease or loan if the vehicle is destroyed or stolen. Filing 91 at 11. Defendant Universal Warranty marketed VehicleOne-branded vehicle service contracts and VehicleOne Primary-branded GAP contracts. Filing 91 at 11. Universal Warranty also offered another vehicle service contract known as the GM Protection Plan. Filing

---

[1] B. Thomas and Company does business as National Financial Services ("National Financial"), *see* Filing 1 at 1, and both parties refer to the business as National Financial rather than B. Thomas and Company throughout their briefing. *See* Filing 80; Filing 91; Filing 98.

[81-17 at 4](). The GM Protection Plan was generally marketed directly to dealers by Universal Warranty's in-house sales employees rather than through the use of independent agents like National Financial. [Filing 81-17 at 4](); [Filing 91 at 14]().

In November of 2016, Ally's license to use General Motors' name and trademark expired, so Ally retired the GM Protection Plan. [Filing 81-17 at 4](). Ally then implemented a new vehicle service contract known as Ally Premier Protection ("Ally Premier"). [Filing 81-17 at 5](). Defendants designed Ally Premier to replace the GM Protection Plan and potentially the VehicleOne vehicle service contracts as well. [Filing 81-17 at 5](); [Filing 92-10 at 1](); [Filing 92-17 at 1](). Defendants have not allowed National Financial to sell Ally Premier, and thus National Financial has not earned any commissions from that product. [Filing 98 at 15](); [Filing 99-1]().

### C. The Contracts

*1. VehicleOne Contracts*

National Financial marketed VehicleOne vehicle service contracts to dealers on Universal Warranty's behalf under a contract with Universal Warranty dated March 26, 2003 (the "2003 V1 Rep. Agreement"). [Filing 81-2](). Under a separate contract dated August 1, 2008 (the "2008 V1 GAP Rep. Agreement"), National Financial marketed Universal Warranty's VehicleOne Primary GAP contracts. [Filing 81-8](). Both VehicleOne contracts granted National Financial authority to solicit and service the VehicleOne programs on Universal Warranty's behalf. [Filing 81-2 at 1-2](), §§ 2, 5(a); [Filing 81-8 at 1](), §§ 3-4. When National Financial successfully solicited a dealer to sell Universal Warranty's VehicleOne products, Universal Warranty required each solicited dealer to obtain Universal Warranty's direct contractual authorization, subject to Universal Warranty's discretion to reject any dealer, prior to selling Universal Warranty's products. [Filing 81-18 at 25](); [Filing 81-2 at 2](), § 5(a); [Filing 81-8 at 1](), § 6(a).

National Financial was eligible to receive a "representative fee" or commission on certain Universal Warranty contracts. Specifically, National Financial received a representative fee when three requirements were met: a dealer National Financial had solicited sold a contract to a consumer, Universal Warranty had "received the Dealer Cost, and . . . [National Financial wa]s currently servicing such Dealer account on behalf of [Universal Warranty]." Filing 81-2 at 2, § 7(b); Filing 81-8 at 3, § 8(b). Both the 2003 V1 Rep. Agreement and 2008 V1 GAP Rep. Agreement limited representative fee payments to the sale of VehicleOne products. Filing 91 at 16. Either National Financial or Universal Warranty could terminate the 2003 V1 Rep. Agreement and 2008 V1 GAP Rep. Agreement without cause sixty days after giving the other party written notice. Filing 81-2 at 4, § 16; Filing 81-8 at 5, § 17.

On March 12, 2003, Universal Warranty sent a signed letter to, National Financial's then-owner, Charles Ballou informing him that Universal Warranty would pay commissions under the 2003 V1 Rep. Agreement even after its termination provided certain requirements were met, including that National Financial continued to service the dealer accounts on behalf of Universal Warranty. Filing 81-3. The parties have honored the promises made in this letter as to the 2003 V1 Rep. Agreement and payments as promised in the letter are not in dispute because Defendants have made and continue to make such payments. Filing 81-18 at 14.

### 2. *Universal Warranty Contracts*

On October 2, 2003, National Financial and Universal Warranty executed a contract (the "2003 Universal Warranty Rep. Agreement") authorizing National Financial "to solicit and service [Universal Warranty's] vehicle service contract program." Filing 81-5 at 1. This contract did not specify a particular type or category of vehicle service contract. *See generally* Filing 81-5. However, National Financial's then-owner, Ballou, returned a signed copy of the agreement to

Universal Warranty with an accompanying transmittal letter stating, "I am faxing you the agency agreement authorizing [National Financial] to offer other Universal Warranty programs in addition to VehicleOne." Filing 81-4. However, Ballou later stated he understood the contract as authorizing him to solicit a specific product known as the AutoMax service program. Filing 99-4 at 10.

On May 1, 2005, National Financial and Universal Warranty executed a contract authorizing National Financial to solicit and service Universal Warranty's AC Delco vehicle service contract program (the "2005 AC Delco Rep. Agreement"). Filing 81-6. On October 20, 2005, Universal Warranty and National Financial executed a contract authorizing National Financial to solicit and service Universal Warranty's SAAB vehicle service contract program (the "2005 SAAB Rep. Agreement"). Filing 81-7. Similar to the V1 Rep. Agreement, these contracts allowed National Financial to receive a representative fee only if Universal Warranty had already received payment from the dealer and National Financial was currently servicing the dealer "on behalf of [Universal Warranty]." Filing 81-5 at 2-3, § 7(b).

On March 24, 2010, National Financial and Universal Warranty executed another contract (the "2010 Universal Warranty Rep. Agreement") authorizing National Financial "to solicit and service [Universal Warranty]'s vehicle service contracts." Filing 81-9. This contract did not reference any specific branded product and stated it "constitute[d] the entire agreement between the parties with respect to its subject matter, and any prior agreement, whether oral or written, shall be of no further force or effect." Filing 81-9 at 4, § 18. The 2010 Universal Warranty Rep. Agreement specifically stated that National Financial was not entitled to representative fees after termination of the agreement. Filing 81-9 at 4, § 16(g).

3. *The Core Representative Addendum*

In 2013, National Financial and Universal Warranty executed another contract (the "Core Rep. Addendum") which amended and supplemented both the "VehicleOne Program Representative Agreement in effect as of March 24, 2010, and the VehicleOne Primary GAP Program Representative Agreement in effect as of August 1, 2008." Filing 81-10 at 1. The Core Rep. Addendum did not further clarify whether it applied to the 2003 V1 Rep. Agreement executed on March 26, 2003, or the 2010 Universal Warranty Rep. Agreement executed on March 24, 2010. Filing 81-10. The Core Rep. Addendum allowed National Financial to share in the profits of its vehicle service contract sales in exchange for exclusively offering VehicleOne products. Filing 81-10 at 1-1, §§ 1(a)(i), (b). This was in contrast to the previous arrangement which only allowed National Financial to receive a representative fee. However, the new fee-sharing arrangement only applied to "Assigned Dealers," which were "dealer[s] for which responsibility to market and service the VehicleOne [vehicle service contract] and GAP programs ha[d] been assigned to [National Financial]" as opposed to National Financial "originating" the relationship. Filing 81-10 at 1, § 1; Filing 91 at 28. Universal Warranty did not assign National Financial any dealers. Filing 81-18 at 16. The Core Rep. Addendum stated that it terminated immediately upon termination of either of the underlying agreements. Filing 81-10 at 3, § 3(b).

*4. Termination*

Universal Warranty issued notice of termination of all agreements on April 29, 2015, with an effective date of July 1, 2015. Filing 81-12 at 1. This termination included the 2003 V1 Rep. Agreement, 2003 Universal Warranty Rep. Agreement, 2005 AC Delco Rep Agreement, 2005 SAAB Rep Agreement, 2008 V1 GAP Rep. Agreement, 2010 Universal Warranty Rep. Agreement, and Core Rep. Addendum. Filing 81-12 at 1. The termination letter stated that all

payments of representative fees to National Financial would end on the termination date except for certain enumerated exceptions. Filing 81-12.

Universal Warranty later discontinued the VehicleOne Primary GAP product effective September 28, 2017. Filing 81-14. Despite termination of the underlying agreement, Universal Warranty continued to pay National Financial post-termination representative fees on VehicleOne service contract sales made by National Financial-solicited dealers that were subject to the 2003 V1 Rep. Agreement. Filing 81-18 at 14. Payments of such commissions were still "open" at the time of Thomas's deposition. Filing 81-18 at 14.

Prior to termination of the contracts, Defendants and/or their agents made numerous statements and gave presentations about incorporating National Financial into their long-term plan, building a long-term relationship, and National Financial, as a Core Agent, playing a key role in growing Ally's business. Filing 92-4; Filing 92-3 at 3; Filing 92-24 at 5; Filing 92-30 at 18, 24.

## III. STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c). "[S]ummary judgment is not disfavored and is designed for every action." *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the

burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except* the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving party need not produce evidence showing "an absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (quoting *Celotex Corp.*, 477 U.S. at 325). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than 'the mere existence of *some* alleged factual dispute'" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Missouri, Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

## IV. DISCUSSION

National Financial alleges claims of breach of contract, tortious interference, unjust enrichment, breach of the duty of good faith and fair dealing, fraudulent concealment, and negligent misrepresentation. *See generally* Filing 1. Universal Warranty and Ally have moved for

summary judgment as to all of National Financial's claims. Filing 79. The Court will address each of National Financial's claims in turn and ultimately will grant summary judgment to Defendants on all claims.

### A. Breach of Contract

National Financial alleges Defendants breached the 2003 V1 Rep. Agreement, 2003 Universal Warranty Rep. Agreement, 2008 V1 GAP Rep. Agreement, 2010 Universal Warranty Rep. Agreement, and the Core Rep. Addendum by failing to pay post-termination commissions on all vehicle service contract and GAP contract sales by National Financial-solicited dealers.[2] Filing 1 at 19-20.

"In order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty." *United States v. Nebraska Beef, Ltd.*, 901 F.3d 930, 934 (8th Cir. 2018) (quoting *Henriksen v. Gleason*, 263 Neb. 840, 643 N.W.2d 652, 658 (2002)).

As an initial matter, the Court notes that "interpretation of a contract and whether the contract is ambiguous are questions of law." *Wintroub v. Nationstar Mortg. LLC*, 303 Neb. 15, 20, 927 N.W.2d 19, 23 (2019). Accordingly, the Court will analyze and interpret each contract.[3] Ultimately, the Court concludes there is no dispute of material fact as to the contracts and their unambiguous language, and Defendants are entitled to judgment as a matter of law on all of National Financial's breach-of-contract claims.

---

[2] Because the Complaint does not allege breach of the 2005 AC Delco and 2005 SAAB Rep. Agreements and the parties do not discuss these agreements beyond generalities, the Court need not address these contracts.

[3] In its response brief (Filing 91), National Financial addresses the 2003 Universal Warranty Rep. Agreement but fails to address Defendants' arguments on several of the contracts, including the 2003 V1 Rep. Agreement, 2010 Universal Warranty Rep. Agreement, and Core Rep. Addendum. *See* Filing 80; Filing 91. "[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument." *City of Kennett v. Envtl. Prot. Agency*, 887 F.3d 424, 430 (8th Cir. 2018) (quoting *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009). Though summary judgment is appropriate on this ground alone, the Court will address all contracts for the sake of clarity.

1. *2003 V1 Rep. Agreement*

The Court first addresses whether Universal Warranty breached the 2003 V1 Rep. Agreement. National Financial's Complaint suggests two means by which Universal Warranty may have breached the 2003 V1 Rep. Agreement: by failing to pay any commissions on Ally Premier sales and by failing to pay post-termination commissions on VehicleOne contract sales. Filing 1-1 at 19-20. The Court concludes summary judgment is proper on National Financial's claim for breach of the 2003 V1 Rep. Agreement because Universal Warranty has not breached this contract in either respect.

The Court first examines whether Universal Warranty could have breached the 2003 V1 Rep. Agreement by refusing to pay commissions on Ally Premier sales. By the plain language of its title ("*VehicleOne* Program Representative Agreement"), the 2003 V1 Rep. Agreement only applies to sales of VehicleOne vehicle service contracts. Filing 81-2 at 1 (emphasis added). As such, it cannot apply to Ally Premier or any other brand of vehicle service contracts other than VehicleOne. Thus, National Financial is not entitled to any Ally Premier commissions based on this contract, and Defendants did not breach the contract in this regard.

Turning to whether there is a breach of the 2003 V1 Rep. Agreement for failure to pay post-termination commissions on VehicleOne contract sales, the undisputed facts show no breach. In his deposition, Thomas, on behalf of National Financial, indicated that he had been paid commissions for ongoing sales of VehicleOne contracts after termination of the 2003 V1 Rep. Agreement. Filing 81-18 at 14. Defendants argue this payment is based on a March 12, 2003, letter a Universal Warranty director sent to National Financial. Filing 80 at 19-20. Defendants characterize this letter as a "Perpetuity Amendment" to the 2003 V1 Rep. Agreement which they claim amends the terms of the contract by authorizing National Financial to provide post-

termination servicing to dealers it solicited prior to termination, thereby requiring Universal Warranty to pay post-termination commissions on sales of the VehicleOne products authorized under the 2003 V1 Rep. Agreement. Filing 80 at 19-20. National Financial responds that the letter is merely a statement confirming the parties' understanding that post-termination commissions were allowed by the terms of the 2003 V1 Rep. Agreement. Filing 91 at 20-21. National Financial further notes the author of the letter, a Universal Warranty sales director, believed the letter confirmed that post-termination commissions were available "more broadly" under the 2003 Universal Warranty Rep. Agreement. Filing 91 at 22. However, the language of the letter clearly states that it was written in reference only to the 2003 V1 Rep. Agreement and National Financial does not dispute that fact. Filing 91 at 20. Accordingly, any effect the letter may have is limited to the 2003 V1 Rep. Agreement, pursuant to its plain terms.

Ultimately, the Court need not decide whether the letter was adequate to amend the 2003 V1 Rep. Agreement because there is no dispute that Universal Warranty has, at least until the time of National Financial's deposition, paid National Financial all post-termination representative fees on VehicleOne sales made by National Financial-solicited dealers. Filing 81-18 at 14. Because Universal Warranty has paid and may still be paying any commissions due National Financial, there can be no breach of any duty to pay such commissions. Accordingly, the Court will grant summary judgment on National Financial's claim for breach of the 2003 V1 Rep. Agreement.

2. *2003 Universal Warranty Rep. Agreement*

Summary judgment is proper on National Financial's claim for breach of the 2003 Universal Warranty Rep. Agreement because termination of the agreement ended Universal Warranty's grant of authority to National Financial to solicit and service any contracts on Universal Warranty's behalf. Nebraska case law on contractual interpretation is clear:

> In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. The fact that the parties have suggested opposing meanings of a disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous.

*Gibbons Ranches, L.L.C. v. Bailey*, 289 Neb. 949, 955–56, 857 N.W.2d 808, 813–14 (2015). Parol evidence cannot be used to vary the terms of an unambiguous contract, and the Court must determine the intention of the parties from the contract's contents alone. *Id.* at 959, 857 N.W.2d at 816.

The parties do not dispute the validity of the contract but instead dispute the meaning and intent of the contract's provisions. National Financial urges the Court to find the 2003 Universal Warranty Rep. Agreement ambiguous so the myriad extrinsic evidence it has provided becomes relevant to show National Financial and several Universal Warranty managers believed the 2003 Universal Warranty Rep. Agreement authorized National Financial to service dealers and receive post-termination commissions Filing 91 at 53-56.

The contract clearly provides that "[National Financial] has authority to solicit and service the Program in Dealers as outlined herein." Filing 81-5 at 1. "[National Financial] is not authorized and is expressly forbidden to . . . process [sic] or exercise any authority on behalf of [Universal Warranty] other than expressly stated in this Agreement." Filing 81-5 at 1, § 2. Furthermore, "the Representative Fee will be paid only in respect to those service contracts for which [Universal Warranty] has received the Dealer Cost, and provided [National Financial] is currently servicing such Dealer account *on behalf of [Universal Warranty]*." Filing 81-5 at 2-3, § 7(b) (emphasis

supplied). Either party could terminate the agreement without cause upon giving sixty days' notice. Filing 81-5 at 4, § 16(b). The Court finds no ambiguity in this language.

In *Superior Services, Inc. v. Universal Warranty Corp.*, No. 8:15-CV-396; 8:15-CV-398, 2016 WL 2986253, at \*6 (D. Neb. May 20, 2016), a different plaintiff but the same defendants present in this case argued at the motion-to-dismiss stage over whether contracts similar to those in the present case were ambiguous. The Court concluded in *Superior Services* that the contracts at issue "as amended by the core addenda," were ambiguous as to the requirement to pay post-termination commissions "at this stage in the proceedings." *Id.* In National Financial's response to Defendants' Motion for Summary Judgment, National Financial argues that Defendants ignore the finding of Judge Bataillon in *Superior Services* that the "contractual documents are at least ambiguous, if not inconsistent regarding Defendant's obligation to pay post-termination commissions." Filing 91 at 8; Filing 91 at 53. The Court rejects National Financial's contention that Judge Bataillon's decision in *Superior Services* is applicable or persuasive in the present case.

Judge Bataillon's decision at the motion-to-dismiss stage is distinguishable for several reasons. First, the 2003 Universal Warranty Rep. Agreement was not one of the contracts involved in that case, and the 2003 Universal Warranty Rep. Agreement is not amended by the Core Rep. Addendum. Filing 81-10 at 1 (stating the Core Rep. Addendum is "an amendment and supplement to the VehicleOne Program Representative Agreement in effect as of March 24, 2010 and the VehicleOne Primary GAP Program Representative Agreement in effect as of August 1, 2008" and therefore not an amendment of the 2003 Universal Warranty Rep. Agreement); *see also* Filing 91 at 8, 53. The applicability of the Core Rep Addendum was one of the facts upon which Judge Bataillon relied in finding the contracts ambiguous in *Superior Services* and thus a key distinguishing factor between that case and the one at hand. 2016 WL 2986253, at \*6. Further, this

Court is not obligated to follow Judge Bataillon's conclusion in a different case between different parties, even if the findings in the case were applicable in the present dispute. *See Reid v. BCBSM, Inc.*, 787 F.3d 892, 895 (8th Cir. 2015) (quoting *Gould v. Bowyer*, 11 F.3d 82, 84 (7th Cir. 1993) ("A district court decision binds no judge in any other case, save to the extent that doctrines of preclusion (not stare decisis) apply."). Given the different procedural posture of the case and the different contracts involved, the findings in *Superior Services* are neither conclusive nor binding in this case.

The Court finds the terms of the 2003 Universal Warranty Rep. Agreement unambiguous with regard to the issues raised by Defendants' motion. No extrinsic evidence is necessary to determine that contract's meaning. The agreement granted National Financial authority to solicit and service Universal Warranty products but also limited that authority in certain ways. Just as the agreement granted National Financial authority to solicit and service Universal Warranty products, its termination ended any authority National Financial had to solicit and service Universal Warranty products. Once the agreement was terminated, effective July 1, 2015, National Financial's authority to service dealer accounts *on behalf of Universal Warranty* was likewise terminated. As a result, National Financial could not service dealer accounts in accordance with the terms of the contract, and Universal Warranty was not obligated to pay National Financial any representative fees. Thus, the Court will grant summary judgment on National Financial's claim with respect to the 2003 Universal Warranty Rep. Agreement because Defendants did not breach the contract.

*3. 2008 V1 GAP Rep. Agreement*

Summary judgment is also proper on National Financial's claim for breach of the 2008 V1 GAP Rep. Agreement because termination of the agreement ended Universal Warranty's grant of authority to National Financial to solicit and service any contracts on Universal Warranty's behalf.

As an initial matter, the Court again notes that the 2008 V1 GAP Rep. Agreement only applies to sales of VehicleOne GAP contracts as indicated by its plain language and title: "*VehicleOne* Primary GAP Representative Agreement." Filing 81-8 at 1 (emphasis added). As such, it does not apply to Ally Premier or any vehicle service contracts other than VehicleOne GAP contracts.

Moving on to the issue of post-termination commissions, the Court finds the 2008 V1 GAP Rep. Agreement language regarding National Financial's post-termination authority to be identical to that of the 2003 Universal Warranty Rep. Agreement. The 2008 V1 GAP Rep. Agreement clearly provides that "[National Financial] has authority to solicit and service the Program in Dealers as outlined herein." Filing 81-8 at 1, § 4. "[National Financial] is not authorized and is expressly forbidden to . . . process [sic] or exercise any authority on behalf of [Universal Warranty] other than as expressly stated in this Agreement." Filing 81-8 at 1, § 4(e). Furthermore, "the Representative Fee will be paid only in respect to those debt waiver forms for which [Universal Warranty] has received the Dealer Cost, and provided [National Financial] is currently servicing such Dealer account *on behalf of [Universal Warranty].*" Filing 81-8 at 3, § 8(b) (emphasis supplied). Either party could terminate the agreement without cause upon giving sixty days' notice. Filing 81-8 at 5, § 17(a). The Court finds no ambiguity in this language.

This language is nearly identical to that contained in the 2003 Universal Warranty Rep. Agreement. *See* Filing 81-5. The agreement granted National Financial authority to solicit and service VehicleOne GAP products but also limited that authority in certain ways. Just as the

agreement granted National Financial authority to solicit and service Universal Warranty products, its termination ended any authority National Financial had to solicit and service Universal Warranty products. Once the agreement was terminated, effective July 1, 2015, National Financial's authority to service dealer accounts *on behalf of Universal Warranty* was likewise terminated. As a result, National Financial could not service dealer accounts in accordance with the terms of the contract, and Universal Warranty was not obligated to pay National Financial any representative fees. Thus, the Court will grant summary judgment on National Financial's claim with respect to the 2003 Universal Warranty Rep. Agreement because Defendants did not breach the contract.

### 4. *2010 Universal Warranty Rep. Agreement*[4]

Summary judgment is also proper on National Financial's claim for breach of the 2010 Universal Warranty Rep. Agreement. The agreement specifically states, "[National Financial] shall not be entitled to any Representative Fees on Program sales made by Dealers after the effective date of termination of this Agreement, unless this provision is superseded by any amendment to this Agreement." Filing 81-9 at 4, § 16(g). Once Universal Warranty terminated this agreement, effective July 1, 2015, National Financial's entitlement to any representative fees ended. Accordingly, the Court will grant summary judgment on National Financial's claim for breach of the 2010 Universal Warranty Rep. Agreement.

### 5. *Core Rep. Addendum*

Lastly, summary judgment is proper on National Financial's claim for breach of the Core Rep. Addendum because Universal Warranty did not breach this agreement. The Core Rep.

---

[4] Both parties address whether the 2010 Universal Warranty Rep. Agreement superseded the 2003 Universal Warranty Rep. Agreement and thereby precluded post-termination commission payments. *See* Filing 80 at 38-40; Filing 91 at 56-57. However, as discussed herein, the plain language of both contracts precludes post-termination commission payments. Accordingly, the Court need not address this issue.

Addendum amends and supplements "the VehicleOne Program Representative Agreement in effect as of March 24, 2010 and the VehicleOne Primary GAP Program Representative Agreement in effect as of August 1, 2008." Filing 81-10 at 1. The Core Rep. Addendum allowed National Financial to share in the profits of its vehicle service contract sales in exchange for exclusively offering VehicleOne products. Filing 81-10 at 1-1, §§ 1(a)(i), (b). The agreement does not discuss or include Ally Premier sales. Further, this arrangement only applied to "Assigned Dealers," defined as any dealers originated by Universal Warranty and assigned to National Financial. Filing 81-10 at 1, § 1. Universal Warranty did not assign National Financial any dealers. Filing 81-18 at 16. Therefore, the provisions of the Core Rep. Addendum were inapplicable to National Financial and Universal Warranty could not have breached the contract's terms.

Additionally, the Core Rep. Addendum expressly states that it terminates immediately upon termination of either of the underlying agreements. Filing 81-10 at 3, § 3(b). Regardless of which agreements the Core Rep. Addendum amends and supplements, it suffers the same fate as the underlying agreements in that none of the underlying contracts provide for post-termination commissions. *See supra* Section IV(A)(1) (finding no breach of the 2003 V1 Rep. Agreement); Section IV(A)(2) (finding no breach of the 2003 Universal Warranty Rep. Agreement); Section IV(A)(3) (finding no breach of the 2008 V1 GAP Rep. Agreement). The Court will grant National Financial summary judgment on this final breach of contract claim because (1) the contracts which the Core Rep. Addendum amended were not breached due to either payment of post-termination commissions or National Financial's loss of authority to continue servicing dealers on Universal Warranty's behalf; and (2) Defendants did not breach the additional terms of the Core Rep. Addendum.

## B. Tortious Interference

National Financial also asserts a common-law claim for tortious interference based on Defendants' alleged interference with National Financial's independent relationship with its dealer–customers and "ability to continue servicing its dealer-customers after [termination of all contracts]." Filing 1 at 20-21. National Financial extends its arguments to include tortious interference both before any contracts terminated on July 1, 2015, and after termination. Filing 91 at 67-68.

> To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.

*Steinhausen v. HomeServices of Neb., Inc.*, 289 Neb. 927, 944–45, 857 N.W.2d 816, 831 (2015).

"[A] party to a contract cannot tortiously interfere with that contract as a matter of law." *Fastrich v. Cont'l Gen. Ins. Co.*, No. 8:16CV487, 2017 WL 3610535, at *7 (D. Neb. Aug. 21, 2017) (citing *Huff v. Swartz*, 258 Neb. 820, 827, 606 N.W.2d 461, 467–68 (2000)). But in the insurance-industry context, "independent insurance agents . . . may have business relationships with their clients that are independent of the client-policyholders' contracts with an insurer, and an insurer can tortiously interfere with such an independent relationship." *Id.*

National Financial argues it has relationships with its dealer–customers independent of soliciting them to sell Universal Warranty's products because it marketed other non-Universal Warranty products to dealers as well. Filing 91 at 67; Filing 92-30 at 8. National Financial claims this is the case because it was not merely an agent of Universal Warranty, but it also sold other vehicle service contracts and products to dealers. Filing 91 at 11-12. The facts National Financial points toward in support of its motion all relate to the terms of the 2003 V1 Rep. Agreement, 2003

Universal Warranty Rep. Agreement, 2008 V1 GAP Rep. Agreement, and 2010 Universal Warranty Rep. Agreement, and the Core Rep. Addendum or products discussed therein.

For example, National Financial notes Defendants began competing with National Financial for dealership business prior to the contracts' termination date. Filing 92-55 at 2; Filing 92-56 at 1; Filing 92-18 at 4; 92-20 at 3. "[A]n intentional, but justified, act of interference, such as valid competition, cannot be the basis for a tortious interference claim." *The Lamar Co., LLC v. City of Fremont*, 278 Neb. 485, 498, 771 N.W.2d 894, 906 (2009)). However, use of "improper means" to compete is not privileged. *Id.* at 278 Neb. at 497, 771 N.W.2d at 906. The 2003 V1 Rep. Agreement, 2003 Universal Warranty Rep. Agreement, 2008 V1 GAP Rep. Agreement, and 2010 Universal Warranty Rep. Agreement each expressly state that Universal Warranty's grant of authority to National Financial to solicit and service the vehicle service and GAP contracts addressed within was "non-exclusive." Filing 81-2 at 1, § 1(a); Filing 81-5 at 1, § 1(a); Filing 81-8 at 1, § 3; Filing 81-9 at 1, § 1(a). In no way do these grants of non-exclusive authority prevent Universal Warranty from developing new products, changing its product marketing, or otherwise competing. Thus, Defendants' actions were not improper but were rather a permissible form of competition. Further, Defendants had contractual relationships with the dealers in question. Filing 91 at 13. National Financial's claim for interference is based on contracts to which Defendants are parties and with which they cannot, as a matter of law, tortiously interfere. *See Fastrich*, 2017 WL 3610535, at *7.

National Financial also points to Defendants' act of trying to "cut National Financial out of the equation" by encouraging a dealer to stop selling VehicleOne contracts. Filing 91 at 68. However, National Financial's relationship with this dealer related to VehicleOne contracts arises from National Financial's solicitation and service pursuant to contracts to which Defendants are

parties. Again, Defendants cannot tortiously interfere with such contracts as a matter of law. Accordingly, National Financial's claims of tortious interference fail.

### C. Unjust Enrichment

National Financial next claims that Defendants were unjustly enriched by retaining representative fees that "should be paid to [National Financial]." Filing 1 at 21. National Financial is permitted to allege both breach of contract and unjust enrichment claims arising from the same subject matter. *See Bloedorn Lumber Co. of N. Platte v. Nielson*, 300 Neb. 722, 729, 915 N.W.2d 786, 793 (2018) (citing *Prof'l Recruiters, Inc. v. Oliver*, 235 Neb. 508, 456 N.W.2d 103 (1990)). When a plaintiff alleges both, as National Financial has done here, the Court must first address the contract claim. *Id.* (citing *City of Scottsbluff v. Waste Connections of Neb., Inc.*, 282 Neb. 848, 809 N.W.2d 725 (2011); *Associated Wrecking & Salvage Co. v. Wiekhorst Bros. Excavating & Equip. Co.*, 228 Neb. 764, 424 N.W.2d 343 (1988)).

As discussed above, express contracts govern the subject matter at issue in this case, and Defendants have not breached those contracts. Both Defendants and National Financial acknowledge that an express agreement precludes relief based on unjust enrichment. *See* Filing 80 at 51-52 (citing *City of Scottsbluff*, 282 Neb. at 860, 809 N.W.2d at 740; *Washa v. Miller*, 249 Neb. 941, 950, 546 N.W.2d 813, 818 (1996)); Filing 91 at 69 (citing *Siebler Heating & Air Conditioning v. Jenson*, 212 Neb. 830, 833, 326 N.W.2d 182, 184 (1982)). As a result, the express contracts "supersede" and "displace" National Financial's unjust enrichment claim. *Bloedorn Lumber Co. of N. Platte*, 300 Neb. at 729, 915 N.W.2d at 793. In light of a lack of disputed facts related to this claim and Defendants' entitlement to judgment as a matter of law, the Court will grant summary judgment on National Financial's unjust enrichment claim.

### D. Breach of the Duty of Good Faith and Fair Dealing

National Financial next alleges Universal Warranty breached its implied duty of good faith and fair dealing arising from the agreements between the parties. Filing 1 at 22-23. "The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract." *Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 265 Neb. 133, 143, 655 N.W.2d 390, 400 (2003). "A violation of the covenant of good faith and fair dealing occurs only when a party violates, nullifies, or significantly impairs any benefit of the contract." *Id.* "The scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. *Id.* "The implied covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract." *Id.*

National Financial argues certain facts illustrate a question of fact as to whether Universal Warranty breached its duty of good faith and fair dealing arising from the parties' contracts. *See* Filing 91 at 70-71. The Court will address each.

National Financial argues Universal Warranty competed with National Financial by prodding dealers to sell Ally Premier in place of VehicleOne and by engaging in such competition prior to termination of the parties' contracts. Filing 92-55 at 2; Filing 92-56 at 1; Filing 92-18 at 4; Filing 92-20 at 3. Defendants even "[e]ncourag[ed] dealers to temporarily discontinue selling Ally's products so they could 'cut National Financial out of the equation' and stop paying National Financial post-termination commissions." Filing 92-48 at 2. However, the express terms of the 2003 V1 Rep. Agreement, 2003 Universal Warranty Rep. Agreement, 2008 V1 GAP Rep. Agreement, and 2010 Universal Warranty Rep. Agreement (and, by effect, the 2013 Core Rep. Addendum which amended several of these contracts but did not displace the terms relevant here) each grant National Financial authority to solicit and service certain Universal Warranty products.

*See, e.g.*, [Filing 81-2 at 1-2](#), §§ 2, 5(a); [Filing 81-8 at 1](#), §§ 3-4; [Filing 81-5 at 1](#). Further, each contract states that Universal Warranty's grant of authority to National Financial to solicit and service its vehicle service contracts and GAP contracts was "*non-exclusive*." [Filing 81-2 at 1](#), § 1(a); [Filing 81-5 at 1](#), § 1(a); [Filing 81-8 at 1](#), § 3; [Filing 81-9 at 1](#), § 1(a). The express contract terms do not require Universal Warranty to exclusively rely on National Financial. Instead, the contract terms require Universal Warranty to offer products solicited by National Financial. In short, the contracts in no way prohibit competition.[5] Rather, the contracts allow National Financial to solicit and service Universal Warranty products. Because the purposes and express terms of the contracts do not prohibit competition, "the scope of conduct prohibited by the covenant of good faith is circumscribed" accordingly. *Spanish Oaks, Inc.*, 265 Neb. at 143, 655 N.W.2d at 400.

National Financial also argues Universal Warranty terminated the Core Rep. Addendum in violation of its terms and before National Financial could qualify for the incentives allowed by the contract. However, as previously discussed, the Core Rep. Addendum expressly terminated upon termination of the underlying agreements. *See* [Filing 81-10 at 3](#), § 3(b) ("This Core Addendum shall terminate immediately and without notice in the event of . . . termination of either of the Agreements."). All of the underlying contracts allowed termination by either party without cause upon provision of sixty-days' notice. [Filing 81-2 at 4](#), § 16; [Filing 81-5 at 4](#), § 16(b); [Filing 81-8 at 5](#), § 17. Thus, Universal Warranty did not terminate the Core Rep. Addendum in violation of its terms. Further, Universal Warranty did not terminate the Core Rep. Addendum early or before any contractually promised amount of time had passed because the underlying contracts allowed for termination at any time.

---

[5] Given the contract terms specifically allow for competition, then even if it were true that Defendants encouraged dealers to temporarily discontinue selling any of Defendants' products solicited by National Financial, that would in no way violate the agreement because Defendants had no obligations to sell or prefer Plaintiffs' products over other available products.

Next, National Financial argues Universal Warranty's refusal to pay post-termination commissions on Ally Premier sales breached its duty of good faith and fair dealing. Filing 91 at 71. However, as discussed above, Universal Warranty has no contractual obligation to pay such commissions based on the express terms of the contracts. National Financial also argues Universal Warranty restricted its access to certain dealer information post-termination. Filing 91 at 71. Again, as previously discussed, the plain language of the contracts granted National Financial authority to solicit and service Universal Warranty products, but that authority to act *on behalf of Universal Warranty* ended with the contracts. Therefore, National Financial's access to dealer information ended at the same time. Because no facts show Universal Warranty's violation, nullification, or impairment of any benefits granted by the express purposes and terms of the contracts in question, Universal Warranty did not violate its duty of good faith and fair dealing based on these facts.

Accordingly, summary judgment in Defendants' favor is appropriate on National Financial's breach of good faith and fair dealing claim.

### E. Fraudulent Concealment and Negligent Misrepresentation

National Financial, in its fifth and sixth causes of action, alleges Defendants fraudulently concealed and negligently misrepresented numerous material facts related to Ally Premier. Filing 1 at 23-27. To prove fraudulent concealment or negligent misrepresentation, National Financial must show (1) Defendants had a duty to disclose a material fact; (2) Defendants, with knowledge of the material fact, concealed the fact;[6] (3) the material fact was not within National Financial's

---

[6] While in a fraudulent misrepresentation case the defendant becomes liable for breaching the general duty of good faith or honesty, "in a case of negligent misrepresentation, the defendant need not know the statement is false. That is, the defendant's carelessness or negligence in ascertaining the statement's truth will suffice for negligent misrepresentation." *Lucky 7, L.L.C. v. THT Realty, L.L.C.*, 278 Neb. 997, 1002-03, 775 N.W.2d 671, 675 (2009). In their respective briefs, both parties simultaneously discuss these two distinct claims due to the similarity between their

reasonably diligent attention, observation, and judgment; (4) Defendants concealed the fact; (5) National Financial, reasonably relying on the fact or facts as National Financial believed them to be as the result of the concealment, acted or withheld action; and (6) National Financial was damaged by the its own action or inaction in response to the concealment. *Knights of Columbus Council 3152 v. KFS BD, Inc.*, 280 Neb. 904, 927, 791 N.W.2d 317, 334 (2010).

In support of their request for summary judgment, Defendants argue (1) National Financial did not reasonably rely on any misrepresentations or concealments, (2) National Financial's claims cannot rest on unfulfilled promises or statements of future events, and (3) they do not owe National Financial a duty of disclosure. The Court need not look beyond Defendants' first argument.

In Defendants' first argument, they contend National Financial's reliance on any statements regarding a long-term partnership or access to Ally Premier was unreasonable given the numerous agreements between the parties which all contained sixty-day termination clauses, and all described National Financial as an independent contractor. Filing 80 at 43-45. Defendants rely, in part, on *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.*, 450 F.3d 816, 820 (8th Cir. 2006), in which the court concluded that a contractual provision directly prohibiting the sale of a full-size image precluded a claim of fraudulent concealment based on the defendant's statement implying it would sell a full-size image. In coming to its conclusion, the *Baer* court relied on *Houlihan v. Offerman & Co.*, 31 F.3d 692, 695 (8th Cir. 1994), in which the court applied Minnesota case law when noting, "[r]eliance on implied misrepresentations is unjustifiable . . . if a written contract provision explicitly states a fact completely contradictory to the claimed misrepresentation."

---

elements, with the exception of the defendant's mental state. *See* Filing 80 at 42; Filing 91 at 58; (both citing *Lucky 7, L.L.C.*, 278 Neb. at 1002, 775 N.W.2d at 675). Because the Defendants' mental state is not at issue with respect to these claims and because the claims otherwise share identical elements, the Court will also discuss both fraudulent concealment and negligent misrepresentation in tandem.

Defendants also rely on several Nebraska cases which address the propriety of granting summary judgment or dismissing fraud claims when the plaintiff did not exercise ordinary prudence in relying on a false statement. *See Lucky 7, L.L.C.*, 278 Neb. 997, 775 N.W.2d 671; *Schuelke v. Wilson*, 250 Neb. 334, 549 N.W.2d 176 (1996). In *Lucky 7, L.L.C.,* the court noted that "[j]ustifiable reliance must be decided on a case-by-case basis" in light of the totality of the circumstances, including factors such as "the nature of the transaction, the form and materiality of the representation, the relationship of the parties, the respective intelligence, experience, age, and mental and physical condition of the parties, and their respective knowledge and means of knowledge." *Lucky 7, L.L.C.*, 278 Neb. at 1005, 775 N.W.2d at 677. The court considered, among other things, that the plaintiff was a businessman with experience in the subject matter; the contract contained limiting language; the explicit nature of the contractual provisions; and inspection and price of the property in question. *Id.*

Here, National Financial and Defendants are both experienced and sophisticated parties. Defendants and/or their agents made statements about incorporating National Financial into their long-term plan, a long-term relationship, and National Financial, as a Core Agent, playing a key role in growing Ally's business. Filing 92-4; Filing 92-3 at 3. Defendants allegedly made numerous statements of this tenor, though many such statements are disputed. *See* Filing 92-24 at 5; Filing 92-30 at 18, 24. However, the "means of knowledge" or contract language is undisputed: the parties' contracts were terminable at any time without cause. As a matter of law, the contracts do not provide for post-termination commissions. National Financial had knowledge of these contractual terms. *See Ray Tucker & Sons, Inc. v. GTE Directories Sales Corp.*, 253 Neb. 458, 462, 571 N.W.2d 64, 68 (1997) ("A party is charged with knowledge of the contents of a writing when he signs it . . . .").

The parties had several contracts, none of which provided for a relationship in which National Financial was more than an independent contractor with authority terminable without cause by either party. The agreements contained integration clauses allowing modification only by a written instrument signed by both parties. *See* Filing 81-9 at 4, § 18; Filing 81-2 at 4, § 18; Filing 81-5 at 4, § 18; Filing 81-8 at 5, § 19. In light of the contractual terms known to it, National Financial cannot show reasonable reliance on Defendants' subsequent statements, even assuming such statements were made as alleged by Plaintiff. *See Smidt v. Porter*, 695 N.W.2d 9, 22–23 (Iowa 2005) (holding that an employee could not justifiably rely on an employer's promise of long-term employment when the employee was at-will pursuant to her negotiated employment contract). Accordingly, summary judgment is proper on National Financial's fraudulent-concealment and negligent-misrepresentation claims.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in full.

IT IS ORDERED:

1. Defendants' Motion for Summary Judgment (Filing 79) is granted in full;

2. Defendants' Motion in Limine (Filing 83) is denied as moot;

3. Plaintiff's Complaint is dismissed in its entirety; and

4. A separate judgment will be entered.

Dated this 21st day of February, 2020.

BY THE COURT:

Brian C. Buescher
United States District Judge